THE MARY ANN, etc.

*(District Court, S. D. New York. March 16, 1882.)*

1. COLLISION—CROSSING COURSES—NEGLIGENCE, NOT RUNNING OUT TACK.
   It is negligence in a sailing-vessel, approaching a tug and tow upon a course which would cross their bows, to come partly about and steady in the wind nearly directly in front of the tug and tow, instead of running out her tack. In such case, a collision ensuing, the vessel must be held liable.

2. SAME—CONTRIBUTORY NEGLIGENCE—DUTY TO AVOID COLLISION.
   The tug, in such a case, having notice of the intention of the sailing-vessel, by her lowering sail and steadying in the wind, not to go about, *held*, also chargeable with contributory negligence in keeping on her course unchanged, when a collision might have been avoided by starboarding her helm.

Libel for Collision.

*Beebe, Wilcox & Hobbs,* for libellant.

*Jas. K. Hill* and *Wing & Shoudy,* for the Mary Ann.

*Martin J. Keogh,* for the Locomotive.

BROWN, D. J. In the afternoon of July 6, 1879, the steam-tug Mary Ann was proceeding up the East river, having in tow the canal-boat Florateter, lashed upon her starboard side and projecting some 25 or 30 feet ahead of the tug. They were making from two to three miles per hour against an ebb tide. Shortly before reaching pier 43, being about 150 yards off the New York shore, the Locomotive, a center-board sloop of about 45 tons, was observed coming down the river upon her port tack, the wind being southerly, and making toward the New York shore across the bow of the tug. The pilot of the latter supposed that the sloop would run out her tack towards the New York shore. Instead of doing so, however, the sloop, intending to go in at pier 43, came up into the wind when a little starboard of the tug, and there steadied and proceeded partly to lower her mainsail. This intention of the sloop was not at first understood from the tug, and when first she came up into the wind it was supposed she was

going about on her starboard tack, and if she had done so the tug would have been easily cleared, as would also have been done had she continued upon her port tack. As she steadied with her sails shaking she came down the river with the tide and with her own headway nearly directly towards the tug, but a little to starboard and pointing somewhat towards the Brooklyn shore, and a few moments afterwards she came into collision with the Florateter, whose starboard bows struck the starboard bow of the sloop just forward of her chains, inflicting some damage upon both.

On the part of the tug, it is claimed that the collision was solely due to the improper navigation of the sloop; on the part of the sloop, it is claimed that the tug sheered to starboard just before the collision, and that if she had not done so she would have gone clear.

In many of the details of the testimony there is irreconcilable contradiction; but I am satisfied that the primary cause of the collision was the sloop going only partly about, and steadying in the wind, without due regard to her near proximity to the tug and tow. The evidence shows that her captain and all on board were paying chief attention to the sloop, and the preparations for coming into the dock. For that purpose her captain designed to keep her in the wind until the mainsail was hauled in and partly down, when he could bear off with sufficient sail to reach the dock. Coming partly about and steadying in this manner, within 250 feet of the tug and tow nearly directly ahead, when she was previously crossing the latter's course, and thus bearing down towards them, was a plain violation of the rules of navigation requiring the sloop to keep her course; and it was obvious negligence, irrespective of any special rules, for which the sloop must be held responsible.

The evidence in regard to the sheer by the tug and tow to starboard is also conflicting. Such a sheer is alleged in the libel, but was not sustained by the libellant's own testimony. It is denied by three witnesses from the tug and tow, and asserted by as many from the sloop. It would seem improbable that such a sheer should be made by the tug after the sloop had steadied, upon partly coming about, as the testimony all shows that the sloop was then somewhat to starboard of the tow. That she should have ported her helm, so as to go somewhat to starboard, before the sloop had shown any indication of coming about, might have been probable; but those in charge of the tug say that no change whatsoever was made in her course. Persons upon one vessel testifying in regard to changes of course by

another vessel are very liable to be mistaken from the shifting of her own position and the want of definite bearings. *McNally* v. *Meyer,* 5 Ben. 240. Two disinterested witnesses, on a schooner but a short distance astern of the tug, who saw the collision, testify, however, that she made such a sheer, and that but for this the sloop would have gone clear. They were in a position to observe correctly the course and bearing of both vessels.

Those in charge of the tug and tow agree that the sloop was some 225 feet off when she came into the wind and steadied and lowered her mainsail, and that from that time she came directly down towards them. If her intentions were not from these circumstances fully understood, it was at least clear that she was not intending to go about, and as the sloop was somewhat to starboard, and also heading somewhat to starboard of the tug, it was plainly the duty of the tug from that moment, for the protection of her tow, if not for her own, to go to port as much as possible by starboarding her helm, as well as to stop and back at once. She did stop her engines, and they were afterwards reversed. At what distance from the sloop does not very clearly appear in the claimant's testimony, but at a distance of from 50 to 75 feet only, according to the testimony of the libellant.

Without expressing any opinion in regard to the promptness of the tug in backing her engines, I cannot perceive any excuse for the tug keeping upon her course without any change of her wheel whatsoever in the endeavor to go further to port. There was no obstruction in that direction, and from the angle of the blow upon the starboard bow of each, as well as from the testimony of the witnesses on board the schooner astern, it seems to me clear that the collision would have been avoided had the tug starboarded her helm when apprised of the sloop's intention not to go about, and that the obvious situation and the course of the sloop at the time, which were somewhat to starboard of the tug, clearly indicated this as the duty of the latter, and that in neglecting it the tug must also be held in fault.

Decree for the libellant against both the sloop and the tug, with costs, with a reference to compute the damages.